**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00162 (BAH)** |
| **v.** | : | |
| | : | |
| **GLENN WES LEE CROY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Glenn Croy to two months of incarceration and $500 in restitution.

**I.     Introduction**

The defendant, Glenn Wes Lee Croy, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

The defendant pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, a custodial sentence is appropriate in this case because he (1) entered the Capitol after witnessing law enforcement attempt to keep rioters at bay for over an hour, (2) supported violent, aggressive, and antagonistic actions against law enforcement through his presence in a mob overwhelming law enforcement officers and forcing them to retreat further into the Capitol, (3) disregarded the severity of his actions while he traipsed through the Capitol as if it was an amusement park, (4) wrongfully

1

entered the U.S. Capitol a *second* time, and (5) later bragged about and defended his actions to friends.

The government recognizes that Mr. Croy accepted responsibility early. Nonetheless, that does not excuse his contribution to the riot and its destruction. The defendant twice entered and walked through the Capitol in a mob. While inside, the defendant treated the Capitol like a vacation: he walked freely around the Capitol, took what he apparently perceived to be fun photos and videos of other rioters dressing statues, and posed for his own photograph by a statue that he later sent to his friends. These actions belie the significance of his crime. As described below, the defendant joined a mob entering the Capitol without permission and collectively overwhelming law enforcement. Following his participation in the riot, through conversations with friends, he bragged about breaching the Capitol and defended his actions and the actions of co-rioters. The defendant stands before this Court to be sentenced on a misdemeanor conviction; but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 30, at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Glenn Croy's Role in the January 6, 2021 Attack on the Capitol*

As early as December 27, 2021, the defendant expressed his intention to attend the political rally in Washington DC on January 6, 2021. When Congresswoman Lauren Boebert asked over Twitter, "Who is going to be in DC on January 6th to stand with President Trump?" the defendant responded, "Fellow Coloradan we will be there".

On January 4, 2021, the defendant made plans with his co-defendant, Terry Lindsey, to join him at the rally in Washington D.C. The defendant was driving from his home in Colorado Springs, CO when he sent a private Facebook message to Lindsey that he was "Almost in Illinois" and "Heading to DC to rally against the commies bro." Lindsey asked the defendant "Got room for 1 more," and they made plans for the defendant to pick up Lindsey at his home in Pique, OH to go to Washington D.C.

On January 6, 2021, the defendant, Lindsey, and a female companion all went to the political rally at the Ellipse on the National Mall. Indeed, the three of them spent the entire day together, going from the rally to the steps of the Capitol and twice into the Capitol. When the defendant first arrived at the Capitol from the rally, he stood at the steps of the Capitol for approximately an hour before entering. While in front of the Capitol, he witnessed the violence of rioters overwhelming law enforcement to enter the Capitol Building, while law enforcement did their best to hold them at bay. He witnessed officers shooting pepper balls and throwing smoke and gas grenades at rioters climbing up rails of the steps to the Capitol and into the crowd. One video from his cell phone shows he was upfront against a group of officers at one point, as he filmed officers working their way through the crowd while rioters confronted, harassed, taunted, and jeered at them.

The defendant ultimately entered the U.S. Capitol through the Senate Wing Door at approximately 2:20pm.[1] The U.S. Capitol was first breached in this location when the window immediately adjacent to the door was smashed out by a riot shield, and a rioter jumped through the window over broken glass.



As further depicted in Exhibit 1, the defendant entered through the Senate Wing Door approximately five minutes after this breach. Once inside, the defendant went toward the right to the Crypt. In heading that direction, the defendant would have walked over the shattered glass from the window broken for the rioters to gain entry into the Capitol.

---

[1] After the defendant's guilty plea, the government uncovered video showing the defendant entering the Capitol in a place other than initially known. Further investigation revealed the defendant entered the U.S. Capitol twice, first through the Senate Wing Door and then through the Rotunda Door. Defense counsel and the defendant agreed to the updated facts, reflected in the Defendant's Pretrial Service Report, which more accurately and comprehensively reflects the defendant's actions at the U.S. Capitol on January 6, 2021.



The defendant joined a large crowd inside the Crypt that continued to swell with rioters. A line of law enforcement officers attempted to keep the crowd contained and from further entering the building. As rioters packed into the room, the defendant recorded a video of the scene on his phone, which is shown in Exhibit 2.



At about 2:25pm, roughly five minutes after the defendant entered the Crypt, the presence of such a large number of rioters eventually overwhelmed law enforcement, pushing the officers back as rioters walked through the Crypt and throughout the rest of the Capitol. Exhibit 3 portrays the scene in the Crypt from when the defendant entered the room until the rowdy crowd swelled to the point of breaking the officer's line holding them back.[2]



---

[2] The following screenshot shows the defendant in the Crypt at approximately 20 seconds into Ex. 3.

After helping the crowd push back law enforcement from the Crypt, the defendant walked passed the House Wing Door. In that hallway, he again he joined a crowd that forced another line of law enforcement to retreat further into the Capitol, as shown in Exhibit 4.



Roughly two minutes later, as also shown in Exhibit 4, law enforcement appeared to regain control of this section of the Capitol and escorted rioters back down the hallway. When this occurred, the defendant followed the crowd without further confronting law enforcement officers.

After leaving the hallway by the House Wing Door, the defendant joined a crowd of rioters in the Memorial Hallway. While there, the defendant took photos and videos of other rioters. In one instance, as shown in Exhibit 6,[3] he took a photo of a fellow rioter in front the bust of Václav Havel, on top of which someone had placed a red "Make America Great Again" hat.

---

[3] The defendant first appears in the lower right corner of the screen at approximately 2:35 minutes into Exhibit 6.

In another instance, also shown in Exhibit 6, the defendant took a video of his companion decorating a statute of Winston Churchill with sunglasses and a hat.





At another point while in the Capitol Building, the defendant had a photo of himself and Terry Lindsey taken in front of the Lincoln the Legislator statue.



After walking through the Memorial Hallway, the defendant exited the Capitol Building through the Memorial Doors at roughly 2:37pm. Once outside, the defendant stayed on the grounds of the Capitol close to the Capitol Building for approximately 40 to 45 minutes.

Rather than leaving the Capitol grounds at that time, the defendant apparently decided that he had not yet had enough; and he entered the building a second time through the Rotunda Doors at approximately 3:20 pm. As portrayed in Exhibit 7, the defendant even used his cell phone to record his walk through the crowd to get to the Rotunda Door entryway.



  The scene at the Rotunda Door was as chaotic if not more chaotic than when the

defendant first entered the Capitol building. A large group of rioters had already filled the room

as the defendant made his way to the entrance at the Rotunda Door. As Exhibit 8 depicts, the

defendant then plowed into the Rotunda in a crowd of other rioters collectively pushing past law

enforcement at the door.





Once inside again, the defendant went to the Rotunda of the Capitol Building. While in the Rotunda, as shown in Exhibit 9, he was eventually rounded up with other rioters by law enforcement. From there, he was escorted out of the Capitol Building again through the Memorial Doors at approximately 3:30pm.

The defendant began bragging about his entry into the U.S. Capitol before he left the building. On January 6 at around 3:17pm, the defendant sent a private Facebook message to a friend, claiming "We stormed the Capitol." When the friend responded, "Did Congressmen Bail," the defendant wrote "Absolutely I got videos but to big [sic] shifty." Notably, the videos on the defendant's phone do not show Congressmen fleeing. However, videos on the defendant's phone from January 6, show scenes from the Ellipse during the political rally, the riotous scene outside the Capitol, and a few videos of the defendant both inside the Capitol and walking up to the Rotunda as previously discussed.

On January 7 and 8, 2021 the defendant continued to communicate with others about his time in the U.S. Capitol. On both days, he sent private messages to friends with the photo of himself and Terry Lindsey in front of the Lincoln the Legislator statute. On January 8, the defendant defended his actions in different comments over Facebook. In one comment, he claimed "because it wasn't a coup it was frustration and a protest." In another, he wrote:

> Civil unrest was already here and has been exasperated by watching this go on got the last 9 months Noone burned anything in there Noone was there to loot Noone was armed with molotovs and explosive fireworks that was a legit mostly peaceful protest unlike the burning buildings we see during the summer and are told is mostly peaceful

The defendant's comments over Facebook are limited and largely directed in private messages. However, one witness advised within a week from January 6, that the defendant had deleted photos and videos from his Facebook account as well as the account itself. This witness provided the government with copies of videos that the defendant had sent him through Facebook messenger. Additionally, after texting Terry Lindsey to check in on him, on January 23, 2021, the defendant sent Lindsey a text message advising that he "Got banned from Facebook haven't even posted on there for over 2 weeks."

The defendant also used his cell phone to discuss his entry in the U.S. Capitol with other friends. For instance, on January 6, 2021, the defendant sent messages to one friend, stating "Inside the capitol," "Hell yeah bro haven't had good mosh in awhile," and "we stormed that shit." On January 7, 2021 and continuing over the next several days, he sent multiple friends a video link (https://theresistance.video/watch?id=5ff6857e00bac0328da8e888) of the Capitol Riot, at times pointing himself out a the 13 minute mark. A review of that video shows the defendant entering the U.S. Capitol through the Senate Wing Door, chanting "Whose House, Our House!" Over the next several days, the defendant continued chatting with friends about his participation in the Capitol Riot. On January 9, 2021, he told a friend "I don't regret it needed to be done it felt good to let them see what their antifa thugs have been making Americans across the country feel good the let them know we are fed up."

*The Charges and Plea Agreement*

On February 16, 2021, Glenn Croy was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 17, 2021, he was arrested at the Colorado Springs Police Department, Gold Hill Substation in Colorado Springs, Colorado. On February 26, 2021, the defendant was charged by Information with the same crimes. On August 9, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). In his plea agreement, the defendant "acknowledge[d] that the riot that occurred on January 6, 2021, caused, as of May 17, 2021, approximately $1,495,326.55 damage to the United States Capitol" and "agree[d] as part of the plea in this matter to pay restitution to the Department of Treasury in the amount of $500." Plea Agreement, ECF No. 29, ¶ 11. Additionally, the defendant agreed to voluntarily interview with law enforcement. Mr. Croy has both paid restitution and interviewed with law enforcement.

### III.   Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, all of the Section 3553(a) factors weigh in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. So, too, does the conviction this defendant now faces. Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 is not like picketing at the Capitol some other day, without other rioters present.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at

14

a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Before entering the building, the defendant stood at the steps of the U.S. Capitol *for over an hour*. While standing there, he witnessed officers shooting pepper balls and throwing smoke and gas grenades at rioters climbing up rails of the steps to the Capitol and into the crowd. He even practically brushed against a group of officers as his fellow rioters confronted and harassed them. It strains credulity that, while witnessing law enforcement repelling rioters and rioters harassing officers, he still thought he could remain on the restricted grounds outside the Capitol. Nonetheless, at his guilty plea hearing, he excused his presence on those grounds through the presence of others: "I just knew that everybody was there. Everybody walked from the Washington Monument up to

the Capitol, and we were walking with a huge crowd." Tr. 8/9/2021 at 22. The defendant's rationale underscores the dangerousness of his actions: in following the crowd, the defendant aided violent rioters through his mere presence by adding numbers to the rioters overwhelming law enforcement's efforts to the keep the Capitol safe. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

More concerning, the defendant knew from law enforcement's actions that he did not have permission to enter the Capitol. He did so anyway – *twice*. The defendant first entered the U.S. Capitol through the Senate Wing Door in a stream of rioters pouring into the building. Moreover, he walked through the doors roughly five minutes after the adjoining window was first smashed with a riot shield and doors then kicked open to allow in rioters. As he entered, the defendant chanted "Whose House, Our House!" He would have then walked over the shattered glass of the window as he went to the Crypt. Once in the Crypt, he filmed the scene as he and other rioters packed the room and eventually pushed back law enforcement officers to go further into the Capitol. He continued to walk with the mob through the hallway by the House Wing door, again pushing back law enforcement through overpowering them with the size of their crowd.

While inside, the defendant treated the U.S. Capitol like an amusement park, taking photos and videos of himself and fellow rioters dressing up statutes and later widely sharing them while bragging about his actions. Through treating his breach of the U.S. Capitol in this way, the defendant displayed his lack of concern about how he participated in the riot and, through his presence, aided other more violent rioters. He showed no concern for the fact that the mob's

collective actions ultimately, though temporarily, stopped Congress from fulfilling its obligation to certify the Presidential election.

As if his first trip through the Capitol was not enough, after watching the action on the outside for another 40 minutes, the defendant entered the building a second time in a manner as chaotic as his first entry. When he entered through the Rotunda door, he plowed into the building in a crowd of other rioters that collectively pushed past several law enforcement officers, engulfing one of them in their midst. In addition to this forceful entry into the Capitol, the defendant would have heard an alarm sounding throughout the Capitol rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. Every indication of how he entered the U.S. Capitol – both the first and second time – underscores that he did not have permission to be there and could not have thought he had permission to be there.

Moreover, Mr. Croy's initial defiance of his actions shows he did not just blindly follow other rioters; rather, he intentionally joined the mob wrongfully enter the Capitol building, disrupting congress and causing destruction in its wake. His justifications were immediate, chanting "Whose House, Our House!" when entering the Capitol as if he and his fellow rioters were claiming the Capitol as their own. While still at the Capitol, he candidly bragged about his actions, explicitly stating "We stormed the capitol" and joking at the notion of congressmen fleeing. He emphasized his actions to another friend, claiming he "stormed that shit," having referred to the Capitol riot as a "good mosh."  He later outright expressed "I don't regret it needed to be done[.]" More than blindly join rioters, the defendant was adamant and persistent in his actions when he entered the U.S. Capitol that day.

For these reasons, the nature and circumstances of the offense supports a sentence of incarceration.

**B.  The History and Characteristics of the Defendant**

As set forth in the PSR, the defendant has previously been arrested for several offenses that range in their severity. In 1999, the defendant was convicted of a misdemeanor assault. In 2000, he was convicted of a misdemeanor traffic violation. In 2005, Glenn Croy was convicted of a felony violation of Marijuana Cultivation. The defendant has also been convicted of traffic infractions. In addition to these convictions, the defendant's criminal history also shows he was arrested on September 16, 1995 in Butte, Montana for an assault, resulting in a 6-month suspended sentence, though no further information is available. As well, shortly afterwards, the defendant was arrested on November 12, 1995 for Disorderly Conduct and Engaging the Welfare of a Child – 1st Violation, for which he was sentenced to a 10-day suspended sentence and $120 fine, as part of what appears to be a group of people assaulting a single individual. If the Sentencing Guidelines did apply to his offense of conviction, he likely would have 0 criminal history points because of the staleness of his prior convictions. USSG § 4A1.2(e)(3). Accordingly, he would be in Criminal History Category I. USSG § 5A.

The defendant's PSR notes that the defendant will be employed at the time of sentencing. While Mr. Croy shares custody of his two children, ages 15 and 14, with his ex-wife, he is the primary care provider for the children, and they reside primarily with him.

The government also notes that, shortly after receiving a plea agreement from the government, Mr. Croy, through his attorney, expressed a desire to plead guilty, acknowledge his conduct, and promptly resolve his case. Moreover, while working through more recent details of how he entered the U.S. Capitol, he has remained committed to pleading guilty and taking responsibility for the entirety of his actions. Additionally, the defendant has been compliant with his conditions of release throughout the pendency of this case. As previously noted, when

recommending an appropriate sentence, the government gives significant weight to the defendant's early resolution of this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demand deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

The need for specific deterrence in this case is also apparent in light of the defendant's casual disregard for the consequences of his actions and later efforts to defend the riot as peaceful. The defendant witnessed violence and contributed to it through his presence. Yet, after the riot, he seemed proud of his actions, sharing photos and videos of his illegal entry into the Capitol. Likewise, he defended his actions as merely "frustration and a protest" and minimized his "storming the Capitol" by referencing "Civil unrest was already here." Boasting about his criminal

acts and justifying them when challenged shows an unwillingness to recognize the threat he posed. Such an unwillingness merits specific deterrence in itself.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default. Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."[5] *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is

---

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in line with incarceration. The defendant was well aware of the violence surrounding the Capitol, and he entered the Capitol building twice anyway. He contributed to the violence around him by adding his presence to riotous crowds overwhelming law enforcement. He showed no concern for the severity of his actions as he engaged in criminal conduct as if he was on a vacation. Finally, he bragged about and defended his actions to several friends, failing to see the seriousness of his actions.

## V.    Restitution

As noted above, the defendant agreed under the terms of the plea agreement to pay $500 in restitution. The Court asked the government to address restitution in anticipation of the defendant's sentencing, specifically requesting the government explain how it reached the restitution amount reflected in the plea agreement. We submit this explanation to aid the Court.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

22

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).[6]

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[7] *See* 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering

---

[6] Several other criminal statutes authorize restitution for specific offenses. *See, e.g.*, 18 U.S.C. § 43(c) (damaging or interfering with an enterprise involving animals); 18 U.S.C. § 228(d) (child support violations; 18 U.S.C. § 1593 (peonage, slavery, and trafficking in persons); 18 U.S.C. § 2248 (sex crimes); 18 U.S.C. § 2259 (sexual exploitation of children); 18 U.S.C. § 2264 (domestic violence); 18 U.S.C. § 2327 (telemarketing fraud); 18 U.S.C. § 853(q) (amphetamine and methamphetamine offenses). None of those statutes are at issue in this case.

[7] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

23

from bodily injury. *See Papagno*, 639 F.3d at 1096-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[8] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the

---

[8] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[9]

While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement. *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, 2020 WL 220089, *5 (D.N.J. Jan. 15, 2020). As relevant to this case, the sentencing court under the VWPA "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). Under Section 3663(a)(3), a defendant may agree to pay restitution even where the offense of conviction falls outside of the statutes otherwise covered by the VWPA. *See United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008) (upholding restitution agreement under Section 3663(a)(3) where defendant was convicted under 26 U.S.C. § 7201). A defendant's agreement to pay restitution under Section 3663(a)(3) is a binding promise, *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005), and the sentencing court is not required to independently evaluate the defendant's ability to pay when restitution is made part of the plea agreement under that provision, *United States v. Allen*, 201 F.3d 163, 167-68 (2d Cir. 2000).

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

Application of these restitution principles to the defendant's case is straightforward. The defendant entered a guilty plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). That offense of conviction does not trigger the MVRA because it does not fall within the "subset" of crimes covered under that statute. *See* 18 U.S.C. § 3663A(c)(1)(A); *Papagno*, 639 F.3d at 1096. Mr. Croy's non-Title 18 offense of conviction also does not fall within the statutes covered by the VWPA. *See* 18 U.S.C. § 3663(a)(1)(A). Restitution here nonetheless properly falls within the scope of Section 3663(a)(3) because the plea agreement requires the defendant to pay $500 in restitution. *See Anderson*, 545 F.3d at 1078-79. The Court thus is authorized to impose restitution "to the extent agreed to by the parties" in the plea agreement. 18 U.S.C. § 3663(a)(3).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h).

The government and Mr. Croy, pursuant to the plea agreement, have requested the Court to apportion liability for restitution for damages arising from the riot at the United States Capitol. For this case, the parties have agreed that the Court may impose restitution in the amount of $500. This amount fairly reflects the defendant's role in the offense and the damages resulting from his

conduct. This amount properly reflects the defendant's role, but also considers the various legal and factual issues associated with calculating the actual losses for property damage to the United States Capitol and incurred by law enforcement agencies, additional costs incurred for security personnel, and bodily injuries sustained by law enforcement personnel. In consideration of these factors, the restitution amount reflected in the plea agreement fairly represents an apportionment of the defendant's liability and, therefore, is proper in this case.

Regarding costs that are subject to restitution, the defendant's plea agreement states that as of May 17, 2021, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages. *See* Plea Agreement, ECF No. 29, ¶ 11. As noted above, determining the restitution amount is an "inexact science," *James*, 564 F.3d at 1246, that must be based on a "reasonable approximation of losses supported by a sound methodology," *Gushlack*, 728 F.3d at 196. The nearly $1.5 million figure quoted in the defendant's plea agreement represented loss estimates provided by Architect of the Capitol as of mid-May 2021. The government continues to investigate losses that resulted from the breach of the Capitol on January 6, 2021, a process that involves several facets. As a factual matter, the government is continuing to collect evidence concerning, *inter alia*, (1) the cost of damage to the Capitol Building and Grounds, both inside (*e.g.*, doors, windows, offices, office equipment, hallways, the Rotunda, the Crypt, etc.) and outside (*e.g.*, doors, windows, barricades, scaffolding, etc.); (2) the costs associated with the deployment of additional law enforcement units to the Capitol on January 6th; (3) the cost of broken or damaged law-enforcement equipment; (4) the cost of stolen property; and (5) costs associated with bodily injuries sustained by law-enforcement officers and other victims. As a legal matter, *some* of these costs (such as property damage and medical injuries) clearly fall within the scope of the restitution statutes as applied to *some* defendants (*e.g.*, defendants who broke a window or committed

27

aggravated assault against an law enforcement officer). But other costs, including employees' work time, *see United States v. Wilfong*, 551 F.3d 1182, 1184 (10th Cir. 2008), and the proper method for assessing value of damaged or destroyed property, *see United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999), raise more challenging questions that should be resolved as they arise. To the extent a victim's losses in a particular case are "not ascertainable" at the time of sentencing, Section 3664 permits an extension of up to 90 days for a "final determination" of those losses. 18 U.S.C. § 3664(d)(5); *see Dolan v. United States*, 560 U.S. 605, 611 (2010) (allowing a sentencing court to order restitution after the 90-day deadline under some circumstances). None of these questions, however, arise in the defendant's case.

**VI.     Conclusion**

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Glenn Wes Lee Croy to two months of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:     /s/ *Clayton O'Connor*
CLAYTON H. O'CONNOR
Trial Attorney, Detailee
MD Bar No. 0512150005
555 Fourth St NW
Washington, DC 20530
Clayton.oconnor@usdoj.gov
(202) 262-9895