**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-000162-1(BAH)** |
| **GLEN WES LEE CROY,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Mr. Croy, through his attorney, Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mr. Croy, he has no objections, just some corrections that have already been sent to the probation officer.  Mr. Croy requests that this Honorable Court impose a sentence of probation with community service to account for:

1.      His family circumstances as primary caretaker of two teenage sons, one that has diabetes; and

2.      His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building.

1

Mr. Croy comes before the Court having plead guilty on August 2021, to count 4 of the Information  filed on February 26th, 2021, charging him with a violation of Title 40 U.S.C. §5104(e)(2)(G).   A sentence of 12 months of probation, with community service,  is a reasonable  sentence that is "sufficient, but not greater than necessary" to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a).  Under the facts of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

1. **BACKGROUND**

   A. **Mr. Croy watches media coverage of The Black Lives Matter protests of 2020 and Trump denouncing the  2020 election**

The summer of 2020 was a violent one for major cities across the United States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM"). After several months of being couped up because of Covid-19, people took to the streets to protest the horrendous murder of George Floyd. Unfortunately, especially in D.C., these protests turned violent.  These protests were widely televised on the nightly news and other media outlets as a necessary process for vocal opposition to systemic racism and the only way  racial justice could be effectuated.  Mr. Croy watched from his home in Colorado and on the internet as hundreds of businesses were destroyed over a period of weeks, several people were injured, and nearly two

billion dollars of damage was done by rioters

nationwide.       https://www.washingtonpost.com/local/dc-braces-for-third-day-of-

protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-

b473-04905b1af82b_story.html ;  https://nypost.com/2020/09/16/riots-following-

george-floyds-death-could-cost-up-to-2b/.

      After the presidential election, Donald Trump (hereinafter "Trump") and his

inner circle  began spreading the word that the election was "stolen" from him by

Democrats and others.    https://www.washingtonpost.com/politics/trump-election-

voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.

False claims were made on media sources, as well as by the President himself, that

the election system had been corrupted and that the integrity of the election should

be questioned.  This Court can only understand why Mr. Croy came from Colorado

to D.C. when taking into account these two pivotal events in our nation's history.

While consumption of media news is no excuse for behavior, it does demonstrate

the powerful impact news stories, fake or real, have on the citizens of this country.

The media sets the tenor for how people feel about their rights and freedoms and

can also plant notions of discontent or even outrage.  After months of watching our

major cities burn, many people became convinced that vocal displays of outrage in

the form of protesting was the only way to make their voices heard.  Additionally,

because very few people were being prosecuted for their criminal behavior while

violently protesting, which was replayed over and over again on the nightly news, the media helped reinforce the notion that there would be little to no consequences for protestor actions. https://www.mauinews.com/opinion/columns/2021/07/heres-why-most-arrested-rioters-will-not-be-prosecuted/; https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002/. Here, in D.C., although hundreds, if not thousands, committed property crimes such as painting  federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible. https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.   Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts. https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power.

Mr. Croy, like millions of other Americans, ate up the media coverage of these events in the Summer of 2020.   He saw the media label destructive and violent riots as "mostly peaceful" protests and the protestors praised on national media outlets for their strongly held beliefs.  And while the majority of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not.  The report suggested that the "disparity stems from political orientation and biased media

framing… such as disproportionate coverage of violent demonstrations."

https://time.com/5886348/report-peaceful-protests/.



Image obtained from video clip at https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

        Mr. Croy similarly had strongly held beliefs after the Presidential election that there had been irregularities in the election that were not proper.  He was also emboldened by a new understanding of how vocal and peaceful protests were being conducted in our country to garner attention for important issues effecting the future of our nation.   He decided to come to D.C. to *peacefully* protest the results of the election and the lack of attention to alleged voting irregularities

(emphasis added).  He did so with no intent to do anything but add his voice to the vocal protests over the injustice he perceived had happened in the election.   He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore a Trump hoodie and a hat and carried a flag.  Mr. Croy committed no violent actions in his peaceful protest.  Mr. Croy did not destroy anything. Mr. Croy's only desire was to participate in a democratic process that is protected under the 1ˢᵗ amendment of our Constitution. Unfortunately, going into the Capitol was not part of that democratic process and he now stands before the Court after admitting  to the Court at his plea hearing that he knew going into the Capitol that day was wrong.

2.  **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

   A.  **Croy's trip to D.C. and his walk to the Capitol**

Mr. Croy believed what he read on the internet and heard from the President himself - that the election had been stolen.   (Croy is a registered Independent and voted for Barack Obama in 2008 because he believed Obama would help the working man).  He believed that there was wrongdoing in the State of Georgia.  He also believed that he should show his support for the soon to be former President by attending his rally and other rallies scheduled for January 6, 2021, at the Ellipse on the Mall.   Importantly, Mr. Croy was fixated on the *process,* not the result of the election. The emphasis on the process, and not the result, is particularly

important because it shows that Mr. Croy values the Constitution and the foundation of our government.

Mr. Croy had always wanted to come to D.C., and this seemed to be the perfect opportunity. At the time, he was unemployed, like hundreds of thousands of other Americans suffering during the pandemic.  He called a friend on the way to D.C. and invited him to come along. At no time did he ever think he was going to the Capitol, let alone inside the Capitol. Not until Trump's speech did he have any intention of  going anywhere other than the Ellipse area, and not being from the area or having attended a protest there before, had no real sense of where things were in relation to each other.  As the day unfolded, he never planned or envisioned entering the U.S. Capitol.  That is, not until Trump invited everyone to march to the Capitol. Mr. Croy and his friends followed the large crowd there that day with no intention of doing anything but having his voice join those of thousands of other peaceful protestors. Now, after seeing what really happened that day by watching film on numerous platforms, Mr. Croy is ashamed of the fact that he was a part of it, albeit a small part of it compared to the many violent protesters who assaulted police officers and caused damage to the Capitol.

    **B.**  **Croy's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know, the crowd overwhelmed the few, unprepared police.[1] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach spurred the evacuation of members of Congress and the Vice President.   More than 30 minutes later, the Senate Wing Doors were penetrated by the crowd, pushing Capitol Police officers back into the inside corridor as they tried to prevent further intrusion.

Mr. Croy was not in this first wave of hundreds of protesters.   In fact,  the video footage shows that  he was at least hundreds of people back behind the original breach. *See* Joint Exhibit 1, CCV Senate Wing Door.  He could not see what was transpiring inside the Capitol. He had no idea of the violence in other parts of the Capitol. In fact,  Mr. Croy had been so far behind the first people in that he had no idea how the door was opened or who opened it. He was, in his words, "following like a lemming" and following others ahead of him. The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mr. Croy's knowledge and intention* as the

---

[1] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

day unfolded. That is, though many others were violent, pushing officers, etc., Mr.

Croy was not violent, carefully observed the situation around him, and acted with

decency (as we will see later).

As they entered the Senate wing door, people around Mr. Croy began to

celebrate. The mood was not unlike other protests in Washington, D.C. and many

around took selfies and appeared peaceful with cameras and flags. Mr. Croy did

not observe any destruction or bad behavior towards the police at this time. He

walked down a long hall. From there,  he followed the crowds  as they walked into

the Crypt and then towards the Memorial Door.  While following aimlessly

through the halls in the Capitol, defendants Croy and Lindsey had a photo of

themselves taken with a statue of Abraham Lincoln entitled, "Lincoln the

Legislator."   Croy and Lindsey exited the U.S. Capitol at approximately 2:40 p.m.

through the Memorial Door after being inside the Capitol for approximately 20

minutes.

Once outside the Capitol, Croy and Lindsey remained near the Capitol

Building for approximately 40 to 45 minutes.  At approximately 3:20pm, Croy and

Lindsey  heard word of a shooting incident inside the Capitol.  While still outside,

Mr. Croy observed a man in a bloody shirt make his way down the stairs. This was

shocking to Mr. Croy.

Curious to see if they could find out more and help anyone hurt, they headed to the entrance again at the top of the Rotunda doors. People were milling around the crowded area. As they stood there not knowing what to do, a sudden surge in the crowd pushed them quickly through the doors and they were forced into the main entry way.  *See* video exhibit 7, CCV Rotunda Door Interior.

Just inside these doors, Mr. Croy was  immediately pepper sprayed directly in his eyes.  *See*  photos in Government affidavit to criminal complaint, pgs. 6-7, ECF #1.  A police officer offered to  help him and as Mr. Croy got down the stairs, another officer offered him water and Mr. Croy was able to wash out his eyes. They then exited the Capitol again through the Memorial Door at approximately 3:30pm, after being inside the U.S. Capitol for an additional approximately 9 minutes. Mr. Croy and Lindsay heard there was a curfew, immediately went back to their hotel, spent the night and drove home the next day. As stated in the statement of offense, there is no evidence defendants Croy or  Lindsey were violent or destructive on the grounds or inside the Capitol. *See* Statement of Facts, ECF #30.

### C. **Hindsight is 20/20.**

Now, in retrospect, Mr. Croy wishes he'd never come to D.C. at all, which is terribly sad because D.C. is incredible in so many ways.  He never imagined going inside the Capitol and certainly never thought that violence

would follow.   Importantly, Mr. Croy did not have any intention of stopping the vote.  Indeed, Mr. Croy's aimless following of the crowd through the Capitol that day is evidence of his lack of intent to do something in the Capitol that day, his lack of understanding where he was in the Capitol, and his herd mentality, rather than a desire to execute a plan to stop the vote that was taking place in the Senate.  This Court asked that question specifically of Mr. Croy after a long series of questions during the plea colloquy, that is, if he was there to stop the vote.  Mr. Croy answered yes but that is not accurate.  Taking into account the tone of this Court's voice during the plea colloquy, which can only be described as intimidating ,[2] Mr. Croy agreed to something that he did not do.  When the Court pressed him on the facts one question at a time, he was able to correct his misstatement regarding going into the Capitol.  Unfortunately, he was not given the opportunity to correct his misstatement on stopping the vote. But if his purpose in demonstrating was to stop the vote, he showed no efforts at all to execute that plan.  He was in the Capitol, but followed instructions to leave the Capitol once inside, not once, but twice.  He respected the police officers he encountered and he proceeded out of the building peacefully when shown the way.  This shows that he had no intention of stopping the vote, but merely to have his voice

---

[2] Undersigned counsel means no disrespect to the Court, but the plea colloquy in this case was the toughest in the nearly 30 year criminal prosecution and defense career of undersigned counsel.

heard along with the others walking in the Capitol that day and when told to leave, he did.

Mr. Croy's only intention that day was to have his voice heard.   There is not a scintilla of evidence produced by the government or otherwise that he had any intention to stop the vote, that he went to the Capitol with the express purpose of stopping the vote, that he even knew where the vote even took place within the Capitol that day, and that others were there to stop it. In fact, Mr. Croy had no idea where he was while he was in the Capitol and to this day could not find his way around if given the opportunity.

## D. <u>The Charges and the arrest of Mr. Croy</u>

On February 16, 2021, a  sealed criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Croy and Mr. Lindsey with four misdemeanor offenses related to their conduct on January 6. See ECF No. 1.[3] The following day, Mr. Croy received a call from the local police in Colorado Springs. They told him that an earlier report he made about his stolen vehicle a year before was confirmed and they asked him to come in and discuss it.  When he arrived at 8 a.m., he was met by the FBI and arrested on this case.  He was transferred to Denver,  had his initial appearance in the U.S. District Court for the District of

---

[3] Those four charges are: (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Colorado at 2 p.m., , and was released around 4 p.m. on a $5,000 unsecured bond. *See* ECF #7. Unfortunately, when released,  they didn't give him his wallet, his phone, his coat, nor the shoe laces from his shoes. He was released into the frigid cold so he asked a lady at the federal courthouse if he could wait inside the building.  It was snowing hard. She said yes as long as someone was coming to get him.   Because Mr. Croy was so hungry, and the courthouse was closing, the lady at the courthouse gave him $20 and told him he could wait at the 7/11 a few blocks away, which he did.  At around 8 p.m., Mr. Croy's ride arrived- a friend drove through the snow storm from Colorado Springs to Denver to pick him up.  Mr. Croy had an initial appearance in the U.S. District Court for the District of Columbia  on March 4, 2021, and, again, was released on personal recognizance with conditions. *See* ECF No. 15. On March 5, 2021, Mr. Croy appeared before this Honorable Court for arraignment via video conference. He entered a plea of not guilty. He later entered a plea of guilty again via video conference before this Honorable Court on August 9, 2021. *See* ECF #29-30.

## II.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.

*See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence

imposed to: reflect the seriousness of the offense, promote respect for the law, and

provide just punishment; afford adequate deterrence to criminal conduct; protect

the public from further crimes of the defendant; and provide defendant with needed

educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision:

1.     The nature and circumstances of the offense and the history and characteristics of the defendant;
2.     The need for the sentence imposed;
3.     The kinds of sentences available;
4.     The kinds of sentence and the sentencing range…;
5.      Any pertinent policy statements issued by the Sentencing Commission;
6.     The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.     The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## III.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. **Nature & circumstances of the Offense & the History and Characteristics of Mr. Croy**

After Mr. Croy walked freely into the Capitol on the side with the

scaffolding, he was in awe. He had never been to the Capitol before.  After he

found a bathroom and spoke to 3 police officers,  he had to take  a moment and let

it soak in.  Compared to many other class B misdemeanor cases that have been

filed in this Court, Mr. Croy's conduct is at the bottom of the scale.  First, the

defense is not aware of any evidence that defendant's entry into the Capitol was

preplanned or coordinated with anyone else, including any extremist or organized

groups. His intention was to attend the rally and that did not include going into the

Capitol. Although he does have a co-defendant, the facts show that Mr. Croy

contacted him while en route to the Capitol.  Second, the defense is not aware of

any evidence that the Defendant incited others to commit acts of violence or

destruction. Third, the defense is not aware of any evidence that the Defendant

engaged in any violence or questionable conduct towards law enforcement. In fact,

it's just the opposite. Mr. Croy told the FBI that every interaction he personally

had with the police was a positive experience. When he was pepper sprayed, a

police officer helped him with water and guided him out of the building because he

could not see.   Fourth, the defense is not aware of any evidence that Mr. Croy

destroyed or stole any property from the Capitol. Fifth, based on the Government's

investigation, it appears that the Defendant remained in a limited part of the

Capitol building for a limited period of time – i.e., in one hallway for a little over

ten minutes, and in the Rotunda area for around 9 minutes. The defense is not aware of any evidence that Mr. Croy entered any rooms or offices in the Capitol, any personal space or the Senate or House Chamber.

To his credit, Mr. Croy voluntarily went to the police station under a subterfuge created by the FBI to arrest him on this case.  He later fully acknowledged  his misconduct by answering pointed questions by the FBI agents in a post-plea interview, expressed true and full contrition, and voluntarily turned over evidence including the hotel receipt where he and his co-defendant stayed en route to D.C. He also gave information to the FBI about another participant in the Capitol that day.  He was relieved by the opportunity to take responsibility for his actions.

 Mr. Croy did not come to Washington with the intention of subverting democracy. Mr. Croy came to Washington to peacefully protest what he believed at that time to be a fraudulent election.   By the time Mr. Croy arrived at the U.S. Capitol around 2:00 p.m., many of the barriers that had been erected along the perimeter of the building were no longer present. Mr. Croy and his co-defendant met no resistance in their walk to and inside the Capitol. At the time,  Mr. Croy didn't dream he'd be charged for going into the Capitol.[4]  After seeing the  video

---

[4] Notably, the Department of Justice has declined to bring criminal charges against the speakers or organizers of the rally; the only legal actions initiated against them being civil in nature. *See Thompson et. al., v. Trump et. al.,* 21-cv-00400, ECF No. 1 (Feb. 16, 2021); *Swalwell v. Trump et. al.,* 21-cv-00586, ECF No. 1 (Mar. 5, 2021); *Smith et. al. v. Trump et. al.,* 21-cv-02265, ECF No. 1 (Aug. 26, 2021).  And to think that the lawyers that brought the frivolous

footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made Mr. Croy cringe. He did not witness any of this at all. He is left with deep regret, fear, shame, and remorse.

The government concedes that Mr. Croy committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on the CCTV footage[5] and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property, commit violent acts, or encourage others to do so. He entered and exited through doors. And when he spoke to police officers, it was non-confrontational and respectful, even grateful. After Mr. Croy exited the Capitol the first time, while he was standing at the bottom of the steps, a man in a bloody t-shirt came out of the Capitol and told others lingering there that someone was shot and needed help. Importantly, like the first time Mr. Croy entered the Capitol, there were no police officers telling him not to go up the steps. So, Mr. Croy made his way back up the steps, hoping to not only see what was happening but to offer assistance if he could. The crowd became so tight and physically powerful, that he was later pushed back into the capitol through the Rotunda Door. *See* video exhibit 7 CCV Rotunda interior door, joint

---

election lawsuits have not been sanctioned is mind boggling. At the very least they should be reprimanded for filing the appeal in the Michigan case in the Federal Circuit instead of the Sixth Circuit.

[5] Since Mr. Croy plead guilty, the Government, in an effort to support their request for jail time, has scoured additional CCTV and other video footage in an attempt to "catch" Mr. Croy engaging in violence. After approximately 8 more discovery dumps since his plea, there is none.

submission. It was at this point that he was pepper sprayed, presumably by a police officer. A police officer helped him clear his eyes by offering a bottle of water. Once he got his bearings, he found his way out the same way he went in.  Despite his overwhelming and continuing cooperation with the government, the government now seeks to minimize Croy's acceptance of responsibility because he does walk "in lock step" with the government's theory regarding each and every fact and the reason for each and every action he took on January 6th.  The government's position hardly sets an example for those in the future who would seek to "do the right thing" by offering to cooperate and plead guilty in a timely matter such as the instant one.

This has been a long road for Mr. Croy and his family.  Fortunately, he has a supportive relationship with his immediate family who has stood by him since the beginning of this case and a supportive extended family.   Mr. Croy pled guilty at an early stage in the proceedings thus saving valuable judicial resources. It is of utmost importance to Mr. Croy that this Court understand that  he is incredibly remorseful for his actions on January 6, 2021. There is no doubt that, as he expressed when interviewed by law enforcement, he wishes he had never come to Washington, D.C. on that day.  Mr. Croy has endured life-long damage to his reputation. None of this will be erased from the internet. It's there forever.   He has fully accepted responsibility for his bad judgement in entering the  Capitol building by pleading

guilty in what can be described as the "first wave" of defendants that pled guilty.  He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021. His personal character and reputation will forever be tarnished. His children will suffer as well.  Still, he has had no trouble with the law for more than 16 years-a testament to his commitment to raising two boys on his own which is no easy feat.

Mr. Croy does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm, intended no harm, and regrets that he was even there.  Most telling about Mr. Croy is despite all he has been through, he is working full time now and supporting his children as he always has.  As noted in the PSR, Mr. Croy has had some  minor bumps in the road, but he has proven to be a hard worker, a loyal son and a wonderful father. This Court may ask, who took care of his boys when he was in D.C.? The parent of one of his son's friends watched the boys for the three days he was gone.  His law abiding past for the last 16 years and his  post arrest behavior show that he is capable of being a productive citizen and the Court can rely on that as a basis to sentence him to a term of probation considering the 3553 factors.

Attached to this memo are letters from Mr. Croy and his sons. *See* Defendant's Exhibit 1. Also attached are letters from people who have known Mr. Croy for

many years, including his ex-wife.  Respectfully, these letters of support illustrate that a sentence of probation is appropriate in this case.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a family impoverished when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A period of  probation does constitute punishment  and will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. The National Institute of Justice, Department of Justice, issued a

summary of the current state of empirical research stating that "prison sentences

are unlikely to deter future crime," and "increasing the severity of punishment does

little to deter crime."  U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst.

of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel

S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America

199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

**2.  Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant**

 Mr. Croy's likelihood of recidivism is very low. He has expressed genuine

remorse and contrition, has cooperated fully with law enforcement,  turned over

evidence voluntarily, given information to the FBI about another participant that

they did not have before, and  accepted the first plea offer tendered with no

hesitation. His acceptance of responsibility was complete and without reservation.

He has never tried to minimize his behavior.  On the contrary, he's told his sons

that although they should always stand up to bullies, they should do it within the

bounds of the law.  Research has consistently shown that while the certainty of

being caught and punished has a deterrent effect, "increases in severity of

punishments do not yield significant (if any) marginal deterrent effects." Michael

Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)"

Three National Academy of Science panels… reached that conclusion, as has

every major survey of evidence." *Id*.; See *also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Given Mr. Croy's  age (38), and other issues consistent with what is mentioned above, the likelihood of Mr. Croy ever re-offending is as close to zero as one might come. A  punishment of any jail time  in this case is going to have the exact opposite effect than what is in the interest of justice.  The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. Most important, it leaves his two boys in the stable home they are currently residing in with their father. His oldest son is in an accelerated program for high school students and his youngest son has diabetes. Taking their

father away from them would be devastating, and would almost insure misbehavior by teenage boys. Mr. Croy  urges the Court to adopt the Probation Office's recommendation in this case and impose a probationary sentence in light of his significant family obligations, his sincere and complete remorse, his early and consistent acceptance of responsibility, and the lack of a need to further deter him.[6]

### C.  The kinds of sentences available

The sentencing guidelines do not apply  in this case.  *See* PSR, paragraph 7. The Court should not consider any conduct that Mr. Croy did not plead guilty to. If this Court were to adopt the government's recommendation, as opposed to that of the Probation Office, it would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. *See infra*.[7]

Largely because of his family obligations, Mr. Croy asks that the Court adopt the recommendation of the U.S. Probation Office and impose a 12 -24 month term of probation. In the alternative, he asks that the Court consider a non-custodial sentence with a restriction that he remain on his property except for work and excused absences to take his children to school, church, and medical appointments. In the event the Court finds a period of incarceration warranted, Mr.

---

[6] For those in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,*  at 29 (May 2004).

[7] This does not include every case, just a sampling.

Croy asks that he be allowed to serve it on weekends which is what this Court did

in *United States v. Johnny Taylor,* 15-cr-76(BAH).

Imposition of a fine is discretionary, and, defendant respectfully submits,

should not be ordered in this case.  Defendant's financial condition is such that he

cannot pay any significant fine.  *See* PSR, paragraph 73; U.S.S.G. **§ 5E1.2(a)** (fine

not recommended if defendant unable to pay).

### D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than a probationary term,

community service, and restitution, it would create an unwarranted sentencing

disparity compared to similar cases that have already gone to sentencing in this

Court.  The following cases are a sampling where a misdemeanor was charged and

pled to and resulted in no incarceration:

\*\**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021)
(sentenced to probation);
\*\**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to
probation even though she entered through a broken window and yelled at police
officers);
\*\**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced
to probation);
\*\**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF
Nos. 42 & 44 (sentenced to supervised release with home confinement even though
Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied
media accounts of violence were accurate, minimized the conduct of all of the
rioters, 3) called for a revolution even after the events of January 6, 4) encouraged
the rioters to be proud of their actions, and 5) minimized the impact of that day on
lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21-
00238 (TFH). Judge Hogan imposed a probationary sentence with a short period of

home confinement for Ms. Bustle and an even shorter period of home confinement
for Mr. Bustle. The government recommended probation in this case.
**United States v. Andrew Bennett, Crim. No. 21-227 (JEB)(sentenced to three
months home confinement and two years probation). According to the government,
who recommended probation with a short term of home confinement, Mr. Bennett
espoused conspiracy theories about the election, was an admirer, albeit not a
member of the Proud Boys, and boasted about his conduct. According to the
government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather
planned it for months. He posted numerous times about conspiracy theories and a
fraudulent election. On January 4, 2021, he posted to his Facebook page, "You
better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my
freedom!". On January 6, according to the government, Bennet began
livestreaming video to his Facebook page from outside the Capitol as early as 1:00
p.m. He was in the middle of the growing crowd on the West Front of the Capitol,
where some taunted police officers and sporadically threw objects at them. The
government alleges that someone near Bennett exhorted others to "move forward"
and that Bennett yelled at a police officer. Bennett also filmed assaults on the
police officers and continued to livestream events inside the building.

　　　None of this is to suggest that Mr. Bennett should have received a sentence

of incarceration, only to suggest that the distinctions the government draws are

hard to justify. There is nothing materially different about Mr. Croy or his conduct

that would justify a sentence of incarceration and  such disparate treatment. The

courts have sentenced some January 6 misdemeanor cases to incarceration, but the

nature and circumstances of those offenses, as well as the history and

characteristics of the defendants in those cases, can be distinguished.

　　　 In United States v. Derek Jancart and Erik Rau, 21-cr-00467, the Honorable

Judge Boasberg sentenced both defendants to 45 days of incarceration. However,

in that case, unlike Mr. Croy's, the prosecutors asked for four (4) months of

incarceration for each defendant, citing that the men came to D.C. with gloves, a

gas mask, and two-way radios. *Id.* Additionally, Mr. Jancart posted a video on Facebook during January 6, where he is heard laughing at police while Mr. Rau screamed, "We have you surrounded!" Additionally, Mr. Rau, unlike Mr. Croy, was on probation at the time of his offense on January 6 for domestic violence. Additionally, Judge Chutkan  recently sentenced another January 6 defendant to 45 days of incarceration in *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC)(October 4, 2021). However, Mr. Mazzocco blamed the violence that day on Antifa, deleted his social media accounts in an effort to obscure his actions, and refused to give law enforcement access to the body-worn camera he wore that day, claiming that he did not know where it was. https://www.washingtonpost.com/dc-md-va/2021/10/04/capitol-riot-jail-deter-mazzocco/ In *United States. v. Reeder*, 21 CR 166(TFH), Judge Hogan sentenced Mr. Reeder to 90 days incarceration because he bragged on social media about having engaged in battles with the police inside the Capitol, showed no remorse or contrition, claimed he had no idea he could not be in the Capitol despite being tear-gassed, recorded attacks on police officers inside the Capitol, entered a second time *by forcing himself past police officers who were trying to clear the Capitol*, posted videos bragging about his actions and deleted social media accounts, and most importantly, put his hands on a police officer. Even after pleading guilty, according to the government, he portrayed himself as an innocent victim of circumstances.

Mr. Croy was far more cooperative with law enforcement, did not attempt to hide any evidence,  in fact produced evidence and has not publicly blamed another group for the violence that day.  All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mr. Croy's conduct and characteristics. As suggested by U.S. Probation in its sentencing recommendation, Mr. Croy's actions fall on the low-end of the spectrum that day and his "culpability appears to be minimal in contrast with rioters who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date." *See* p. 1, Probation Recommendation.

## IV. CONCLUSION

Considering all the applicable factors the Court will consider, Mr. Croy respectfully moves this court to impose a sentence of 12 months probation with community service hours.   This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Croy  as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By:    _____/s/_____
       KIRA ANNE WEST
       DC Bar No. 993523
       712 H. St NE, Unit #509
       Washington, D.C. 20005
       Phone: 202-236-2042
       kiraannewest@gmail.com

CERTIFICATE OF SERVICE

I hereby certify on the 22nd  day of October, 2021 a copy of same was delivered to the parties of record, by email  pursuant to the Covid standing order and the  rules of the Clerk of Court.

_____/S/

Kira Anne West
